**EUROPEAN ASIAN BANK, A.G.,**
**Plaintiff-Appellee,**

v.

**G. CROHN & COMPANY,**
**Defendant-Appellant.**

**G. CROHN & COMPANY,**
**Third-Party Plaintiff,**

v.

**H. KHEMCHAND KUNDAMAL ENTER-**
**PRISES (HK), LTD. and H. Khemc-**
**hand Kundamal Bros. (USA), Inc.,**
**Third-Party Defendants.**

**No. 1357, Docket 85–7250.**

United States Court of Appeals,
Second Circuit.

Argued June 7, 1985.

Decided July 31, 1985.

David B. Wolf, New York City (Walter, Conston & Schurtman, P.C., Gregory F. Hauser, New York City, of counsel), for plaintiff-appellee.

Martin Stein, New York City (Phillips, Nizer, Benjamin, Krim & Ballon, New York City, of counsel), for defendant-appellant.

Before LUMBARD, OAKES, and MES-KILL, Circuit Judges.

**LUMBARD, Circuit Judge:**

In this diversity case, G. Crohn & Company ("Crohn")[1] appeals from a March 26, 1985 judgment of the Southern District of New York, after a bench trial before Charles L. Brieant, J., granting plaintiff bank recovery of $292,445.42 plus interest on a bill of exchange. Crohn claims 1) that the district court erred in finding that European Asian Bank, A.G. ("Eurasbank")[2] had become a holder in due course when it purchased a bill of exchange from third-party defendant H. Khemchand Kundamal Enterprises (HK), Ltd. ("Kundamal");[3] and 2) that Crohn had received no valid consideration when it accepted the bill, or, in the alternative, that Crohn should have been relieved of liability anyway due to Kundamal's breach of promised performance. The parties agree that New York law governs this case.

Because we believe that Judge Brieant's finding that Eurasbank gave credit to Kundamal when it purchased the bill of exchange was not clearly erroneous, see Fed. R.Civ.P. 52(a), we agree that Eurasbank became a holder in due course, and thereby was entitled to payment on the bill of exchange regardless of any defenses Crohn might have derived from its agreement with Kundamal. Consequently, we affirm the judgment.

**I.**

Shlomo Sulimani, Crohn's chief executive officer, had engaged in the diamond business for 46 years, and, since 1962, had traded in Indian diamonds. The Kundamal family, which he had known for 25 years, had purchased some 100 shipments of diamonds from Crohn. In July 1983, in a telephone conversation with Hiro Panjabi, a member of the Kundamal family in Hong Kong, Sulimani agreed to purchase from Kundamal a shipment of full cut and single cut polished Indian diamonds. Kundamal would ship the diamonds from Bombay to New York. At the same time, Panjabi would send Crohn an invoice and a bill of exchange for 645,290 Swiss francs payable to Eurasbank, Kundamal's Hong Kong bank. Sulimani agreed to sign and accept the bill once it arrived and thereby to obligate Crohn to pay Eurasbank the specified amount 180 days after acceptance.

Eurasbank purchased the bill of exchange from Kundamal on July 13, 1983. A Collection Order form from Eurasbank, dated July 13, 1983, shows that Kundamal instructed Eurasbank to apply the amount of the bill to certain "trust receipts" that Kundamal owed to Eurasbank and which the district court found to be antecedent debts. According to these instructions, the bank would give credit to Kundamal's account and retire Kundamal's outstanding debts.

The bank's accounting treatment of the credit given to Kundamal is less than crystal clear. Eurasbank produced as evidence a page from a monthly statement used to report movements in an account. This exhibit indicates that, on July 13, 1983, Eurasbank *credited* Kundamal's account by 645,270 Swiss francs, the full amount of the bill of exchange. An exhibit introduced by Crohn, which shows a similar page from a second monthly statement, indicates that on the same date, Eurasbank *debited* a second Kundamal account in the same amount. Hans Kaebe, manager of the bank's bills department, described this entry as a "bookkeeping requirement."

Six days later, on July 19, 1983, the bank made additional *debits*, totalling the full 645,270 Swiss francs, this time to the

---

1. Crohn is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York City.

2. Eurasbank is a stock corporation incorporated and existing under the laws of the Federal Republic of Germany (West Germany). Eurasbank has its principal place of business in Hamburg, West Germany, and maintains and operates a registered branch in Hong Kong.

3. Judge Brieant rendered a default judgment in favor of Crohn against third-party defendants H. Khemchand Kundamal Enterprises (HK), Ltd. of Hong Kong and H. Khemchand Kundamal Bros. (USA), Inc. of New York ("Kundamal") for making no appearance in the case. This default judgment has no bearing on whether Crohn is liable to Eurasbank, and also presents no issues in this appeal.

"trust receipts" as Kundamal had instructed on the Collection Order form. These debits appear on the monthly statement exhibit introduced into evidence by Eurasbank. However, the "bookkeeping requirement" for these additional debits is not shown in the record. No corresponding credit appears on the second account, and Kaebe testified that the debit in that account has continued through the present.

The diamonds arrived in New York before the invoice and the bill of exchange. Kundamal instructed Eurasbank to direct its New York correspondent bank, Algemene Bank Nederland ("ABN"), to release the diamonds to Crohn upon receipt of the latter's written undertaking to accept later the bill of exchange.

On July 18, 1983, Sulimani, on Crohn's behalf, signed a promissory note payable to ABN in Swiss francs for the same amount as the bill of exchange. This note was intended to serve as a temporary substitute for the bill. Sulimani gave the note to ABN, which released the diamonds.

Two days later, on July 20, 1983, the day after Eurasbank had entered the additional debits in Kundamal's "trust receipt" accounts, Crohn received the diamonds and the invoice. Sulimani inspected the diamonds and immediately rejected them as non-conforming goods. The district court found that the diamonds had half the value that Sulimani had expected.

Sulimani telephoned Hiro Panjabi in Hong Kong. They agreed that Sulimani would return the diamonds to Hiro's brother, Anoop Panjabi, who headed the Kundamal operation in New York. Hiro Panjabi promised to "take care" of the ABN note.

Hiro Panjabi then contacted his brother in New York, and on July 21st the latter gave to Sulimani a promissory note for $305,824.65 (the U.S. dollar equivalent of Crohn's Swiss franc note to ABN) due on January 15, 1984, three days prior to the due date on the ABN note. Anoop Panjabi accepted Crohn's return of the diamonds at that time.

Neither Crohn nor Kundamal informed Eurasbank or ABN that Crohn had returned the diamonds. On or about August 2, 1983, ABN presented the bill of exchange to Crohn for acceptance. Sulimani again telephoned Hiro Panjabi who continued to promise to satisfy Kundamal's debts to Eurasbank in Hong Kong if Crohn signed the bill of exchange which was payable to Eurasbank.

About August 6th, Sulimani signed and accepted the bill. Eurasbank still had no knowledge that Crohn had returned the diamonds and did not learn of Crohn's accepting the bill until three months later on November 4, 1983.

Kundamal's promissory note to Crohn was due January 15, 1984. Crohn's payment on the bill of exchange was due the next month on February 6, 1984. Shortly before Kundamal's note matured, Kundamal requested Crohn to extend the due date for sixty days to March 15, 1984. Crohn agreed, and received a similar extension from Eurasbank on the bill. Thus, Crohn remained able to collect on Kundamal's promissory note prior to the due date of the bill.

About March 15, 1984, Kundamal failed to honor its promissory note. Crohn, in turn, failed to honor the bill of exchange when it became due.

Although Eurasbank could have reversed the credits it had given to Kundamal, the bank never did reverse the credits. But, even so, reversing the credits would have been futile because in May or June of 1984, Kundamal became insolvent.

## II.

We agree with Judge Brieant that Eurasbank became a holder in due course.

The obligor on a bill of exchange may assert against a person who purchases the bill any defenses he may have against the bill's drawer unless the purchaser has the rights of a holder in due course. *See* N.Y. U.C.C. § 3–306 (McKinney 1964). A holder in due course is a holder who takes the instrument for value, in good faith and

without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person. *See* N.Y.U.C.C. § 3–302(1) (McKinney 1964). The parties do not dispute that Eurasbank took the bill in good faith and without notice of any claims or defenses. Crohn argues only that Eurasbank gave no value.

Judge Brieant found that Eurasbank had given value when it credited Kundamal's account and applied the credit to retire the outstanding balances on Kundamal's antecedent debts, which took the form of "trust receipts." This transaction complied with one of the Uniform Commercial Code's definitions of taking for value which states that "[a] holder takes the instrument for value . . . when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due." N.Y.U.C.C. § 3–303(b) (McKinney 1964). A bank can give value by taking a security interest in an instrument. *See* N.Y.U.C.C. § 4–209 (McKinney 1964). A bank has taken a security interest "in case of an item deposited in an account to the extent to which credit given for the item has been withdrawn or applied." N.Y.U.C.C. § 4–208(1)(a) (McKinney 1964).

Crohn, however, argues that Eurasbank gave no value when it credited Kundamal's account because it simultaneously debited a second account in the same amount, and thereby immediately reinstated the outstanding obligations. This debit on the second account remains, and was not reversed when Eurasbank later applied the credit to the "trust receipt" accounts.

Judge Brieant concluded that this remaining debit entry, as a "bookkeeping requirement," could have shown "an asset account for an outstanding sight draft," representing the funds Eurasbank could collect from Crohn. Although it would have been preferable for the district court to have had a more complete set of accounting entries with a more explicit explanation of their significance, we find that the evidence is more supportive than not of

Judge Brieant's determination. Consequently, we cannot say that his finding that Eurasbank applied the credit to Kundamal's antecedent debts was clearly erroneous. *See* Fed.R.Civ.P. 52(a).

Crohn also argues that Eurasbank gave no value because it applied only a provisional credit to the antecedent debts. Printed language on the reverse of the bank's Collection Order form states that:

> . . . it is understood that such credit is conditional and is subject to collection and receipt by [the bank] of the requisite number of dollars; in the absence of such receipt and collection by [the bank], the undersigned [i.e. Kundamal] will, upon [the bank's] demand reimburse [the bank] for the amount so advanced plus the agreed rate of interest for the time outstanding.

Judge Brieant found that such language made conditional the credit which Eurasbank applied to the antecedent debts. So, Crohn argues that, under *Marine Midland Bank-New York v. Graybar Electric Co.,* 41 N.Y.2d 703, 363 N.E.2d 1139, 395 N.Y. S.2d 403 (1977), which states that "the giving of a provisional credit is not a parting with value under the Uniform Commercial Code," *id.* at 712, 363 N.E.2d at 1145, 395 N.Y.S.2d at 409, Eurasbank should not have been found to be a holder in due course.

The holding in *Marine Midland* does not require us to decide against the bank in this case, because in *Marine Midland,* the bank could reverse the credit at any time, and, in fact did reverse the credit, *id.* at 712, 363 N.E.2d at 1145, 395 N.Y.S.2d at 409, whereas, Eurasbank could not have reversed the credit given to Kundamal until Crohn had defaulted on the bill of exchange.

In *Marine Midland,* a bank withdrew a check deposited into its client's lockbox and unilaterally gave a credit to its client's account which it then applied unilaterally by way of setoff to its client's antecedent debts. Upon forwarding the check to the drawee bank for payment, the bank learned that the client's customer had issued a stop

payment on the check. The bank then reversed the credit and reinstated the debts. Meanwhile, the bank's client had filed for bankruptcy. The bank then sued the client's customer for payment and argued that it had become a holder in due course when it applied the credit to its client's antecedent debts. *See id.* at 706–707, 363 N.E.2d at 1144, 395 N.Y.S.2d at 405–406.

Because the bank in *Marine Midland* could and did reverse the credit, it had neither bound itself to accept the credit risk of its client's customer nor "made available" to its client the benefits of the credit. "Under this analysis the bank is in no worse position than any other creditor," the Court of Appeals observed, "and the bank's unilateral agreement to take the credit for the indebtedness, conditioned on payment of the check for which the credit was given, is recognized for what it was— an attempt to recoup its losses." 41 N.Y.2d at 713, 363 N.E.2d at 1146, 395 N.Y.S.2d at 410.

Unlike the bank in *Marine Midland,* Eurasbank did not unilaterally apply the credit to Kundamal's outstanding obligations. Indeed, Kundamal had expressly instructed the bank to use the credit in that manner. The printed language on the back of the Collection Order form does not say that Eurasbank had a unilateral right to reverse the entries at any time. At best, the language suggests that Kundamal's customer's default on the bill of exchange was a condition precedent to the bank's seeking recourse against the bill's drawer, Kundamal. In this context, the printed language merely expressed the rights which Eurasbank already would have been able to exercise under the Uniform Commercial Code. *See* N.Y.U.C.C. § 3–413(2) (McKinney 1964) (unless drawing without recourse, drawer remains liable for payment on dishonored draft); N.Y.U.C.C. § 3–507(2) (McKinney 1964) ("holder has upon dishonor an immediate right of recourse against drawers or indorsers"). Under provisions which seek to protect transferees and to encourage commercial transactions, it would make little sense if, to become a holder in due course, a transferee must discharge the transferor's obligation.

In essence, to become a holder in due course by applying a credit to antecedent debts, the holder must have agreed to expose itself to the credit risk of the party obligated on the instrument taken in payment of the antecedent debts. As the bank in *Marine Midland,* when it first extended the credits, retained the right unilaterally to reverse the credits, it had refrained from exposing itself to the credit risk of its client's customer. Thus, the position of the bank in *Marine Midland* did not necessitate according it full protection under the Uniform Commercial Code's provisions for a holder in due course. *See* § 3–303 Official Comment 3. Had the bank learned that the item was not likely to be paid, it would not have had to sue on the instrument but could have rescinded the transaction at will. *See id.*

In contrast, Eurasbank did replace Kundamal with Crohn as the primary party to whom it looked to repay the debts originally owed by Kundamal. Had Eurasbank learned that the Crohn-Kundamal deal had gone amiss, it could not have revoked the credits at will, but still would have to wait for Crohn's default, and thereby incur further risk of non-payment by either Crohn or Kundamal.

By applying a credit, which Eurasbank could not reverse at will, to reduce antecedent debts, Eurasbank's transaction had the same practical effect, on the question of its being a holder in due course, as if the bank had made the credit available for "withdrawal as of right," *see* N.Y.U.C.C. § 4–208(1)(b) (McKinney 1964); N.Y.U.C.C. § 4–213(4) (McKinney 1964), and thereby gave the right to Kundamal, itself, to draw down upon the credit and to apply the proceeds to retire the "trust receipts."

As we agree with the district court that Eurasbank became a holder in due course and is entitled to payment from Crohn regardless of Crohn's defenses, *see* N.Y.U.C.C. § 3–305 (McKinney 1964), we need not consider whether there is any merit to those defenses.

Crohn must be content with what relief it may obtain from Judge Brieant's default judgment in Crohn's favor against Kundamal.

Affirmed.